[No. D047683. Fourth Dist., Div. One. Oct. 10, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIA QUIROZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.B., III.C., III.D., and III.E.

**C**OUNSEL

Laura L. Furness, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Scott C. Taylor and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**AARON, J.—**

### I.

### INTRODUCTION

Defendant Maria Quiroz appeals from a judgment of conviction and sentence arising from her participation in a widespread and sophisticated check forgery scheme. As one of 34 codefendants in a 66-count indictment, Quiroz was charged with conspiracy to defraud another, grand theft and forgery of checks. Quiroz admitted that in 2003 she sold her bank account information and personal information to two of her codefendants. After Quiroz sold her information, stolen and forged checks were deposited into her bank account. A few days after the forged checks were deposited into Quiroz's account, someone withdrew thousands of dollars from the account. Quiroz contended in her defense that she believed her account was going to be used to hide drug money, not to pass stolen and forged checks. A jury convicted Quiroz of one count of conspiracy to defraud another and one count of grand theft.

Quiroz challenges the judgment of conviction on seven grounds: (1) that the trial court erred in refusing to hold a hearing to determine whether Quiroz was a minor at the time she committed the alleged offenses; (2) that the court erred in failing to stay the criminal proceedings in favor of juvenile court jurisdiction of Quiroz's case, because Quiroz was 17 years old when she agreed to sell her account information to a codefendant; (3) that the juvenile court should have presumptive jurisdiction over a matter in which the alleged criminal conduct begins when the defendant is a minor and continues after the defendant's 18th birthday; (4) that the court violated Quiroz's Fifth Amendment right against self-incrimination by admitting in evidence pretrial statements she made to postal inspectors before she had been given *Miranda*[1] warnings; (5) that the court erred by admitting evidence of Quiroz's admissions to postal investigators because the admissions were induced by a promise that she would not be prosecuted if she told them the truth; (6) that the prosecutor engaged in misconduct when the prosecutor asked Quiroz a series of questions that effectively forced her to testify that the postal inspectors had lied on the witness stand; and (7) that there was insufficient evidence to support her conviction for conspiracy to defraud.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

While we conclude that none of these contentions raises a meritorious ground for reversing Quiroz's conviction, we agree that the prosecutor's questions about whether the postal inspectors had lied during their trial testimony were improper. However, it is not reasonably probable that the jury would have reached a result more favorable to Quiroz if these questions had not been asked. We therefore affirm Quiroz's conviction.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Procedural background*

By indictment filed March 11, 2005, the People charged Quiroz with conspiracy to defraud another of property, grand theft and forgery of checks. Quiroz was charged together with 33 other defendants in a 66-count indictment.

On September 2, 2005, Quiroz moved to suspend the proceedings pursuant to Welfare and Institutions Code section 604, subdivision (a), on the basis that she was under the age of 18 on the date the alleged offense occurred. The trial court denied the motion to suspend proceedings.

Just before the trial began, Quiroz renewed her request to suspend the proceedings pursuant to section 604, subdivision (a) of the Welfare and Institutions Code. The court denied the request the following day. Quiroz again renewed her request to suspend the proceedings later in the trial. The court denied this request as well.

The court instructed the jury on November 3, 2005. Outside the presence of the jury, Quiroz moved for a mistrial on the ground that the prosecutor had asked Quiroz a series of questions on cross-examination that forced her to say that the postal inspectors who had testified against her were liars. In response to Quiroz's motion, the court read the stricken testimony to the jury and instructed the jury to disregard it. The next day, Quiroz again moved for a mistrial on the same ground. The trial court denied the motion.

On November 4, 2005, the jury found Quiroz guilty of one count of conspiracy to defraud and one count of grand theft, and not guilty of forgery.

On December 9, 2005, the trial court sentenced Quiroz to formal probation for five years. Quiroz filed a timely notice of appeal.

## B. *Factual background*

### 1. *The prosecution's case*

Sometime in January 2003, Quiroz's friend, Erica,[2] told Quiroz that Erica's boyfriend, Gilbert Franco, would be calling Quiroz to talk with her about how she could make some money. Franco called Quiroz later in January and told her he needed her automatic teller machine (ATM) card and personal identification number (PIN), her Social Security number, and her identification card. Quiroz agreed to sell her personal information to Franco; however, precisely when she agreed to do so was disputed. Quiroz testified that she gave Franco her Washington Mutual account information and her personal information three or four days before she turned 18 years old, which was on February 3, 2003. A postal inspector who interviewed Quiroz about her participation in the check forgery scheme testified that Quiroz told the inspector that she agreed to give Franco her account information approximately a month after she had spoken with Erica.

When Quiroz gave Franco her personal and account information, Franco told her not to contact the bank until "they" were finished using her account. Two weeks after Quiroz provided Franco with her information, Franco's brother, Juan Guzman, called Quiroz and told her he had money for her. Quiroz met Guzman at a nearby McDonald's. Guzman gave Quiroz $1,000 and promised to give her another $2,000 at a future date. Guzman later called Quiroz and told her that he would not be giving her any more money because her account had been "frozen."

On February 18, 2003, someone deposited a check for $7,500 into Quiroz's bank account. The check was drawn on an account held by James and Karen Turnbull, and was payable to Quiroz. Bank records show that a withdrawal of $100 was made from Quiroz's account that same day. On February 19, 2003, $300 was withdrawn from the account. On February 20, 2003, someone made withdrawals of $800, $3,000 and $4,500 from Quiroz's account at one of the branch offices. Also on February 20, 2003, someone made an $8,000 ATM deposit into Quiroz's account. That same day, Washington Mutual received and processed a check for $6,500 from Florencia Cacho, made payable to Quiroz. The check was eventually returned because Cacho had insufficient funds in her account to cover the check.

---

[2] Erica is identified by only her first name in the trial transcript.

Washington Mutual has a practice of sending account holders either the originals, or copies of returned checks. Two or three weeks after Quiroz met with Guzman, she received two checks from her bank that had been deposited into her account. None of the handwriting on the checks was Quiroz's, and she had never seen the checks before. Washington Mutual had no record of Quiroz attempting to contact the bank regarding her account.

Postal inspectors John Lund and Ana Flores investigated mail theft complaints for the United States Postal Service. In 2003, Lund began to notice a particular crime recurring. The victims would write checks to various companies and put the checks in the mail. The checks were stolen before they arrived at their intended destinations. The amounts and payees on the checks were then altered, and the amounts were often changed to large, even numbers, such as "five or $6,000." The checks would be deposited into legitimate accounts, and someone would subsequently make withdrawals from those accounts. Sometimes an ATM card was used to withdraw large sums of money, and other times an ATM card and/or personal identification card were used to make a withdrawal inside a bank office. This fraud succeeded because the withdrawals were made only one or two days after an altered check was deposited, and the check would not be returned for insufficient funds until a week or two after having been deposited.

Lund noticed a pattern in these cases: the checks were stolen from the mail in north San Diego County, and the holders of the deposit accounts were between 18 and 24 years old and lived in south San Diego County. Lund estimated that he reviewed at least 70 separate cases that exhibited this pattern.

In early 2003, James Turnbull mailed two checks to the "County Enrichment Program." Neither check reached its intended destination. When Turnbull noticed that $7,500 had been withdrawn from his account for a check he had written for $65, Turnbull contacted his bank. When Turnbull was given a copy of his check, he saw that the payee and the amount of the check had been altered. He did not recognize the handwriting.

A "few years" before the trial in this case, Alice Toothacre mailed a $79 check to her dentist. The check was stolen from the mail, altered, and processed in the amount of $8,000.

On October 16, 2003, postal inspectors Lund and Flores contacted Quiroz at her home. The inspectors asked Quiroz about what had happened with her account earlier that year. Quiroz initially denied any knowledge of how her account had come to be used to pass forged checks, and claimed that her wallet had been stolen. Later during the interview, Quiroz admitted that she had sold her account information to Franco.

## 2. *The defense*

Quiroz testified that in early January 2003, her "best friend" Erica called Quiroz and asked her if she wanted to make some money. Quiroz asked what she would have to do, and Erica told Quiroz that Franco would call her. According to Quiroz, Erica did not provide any details about the plan.

Quiroz stated that she met with Franco three days before her 18th birthday and gave him her bank account information and other personal information. She met with Guzman approximately two weeks after she gave her information to Franco. Guzman paid her $1,000. At a later date, Guzman called Quiroz and told her he would not be giving her more money because her account had been frozen and he could no longer use it.

About two or three weeks after Quiroz met with Guzman, Washington Mutual mailed Quiroz the checks drawn on the Turnbull and Cacho accounts that had been deposited into Quiroz's account. Quiroz was "suspicious" of the checks and thought they may have been forged.

Quiroz testified that she did not know that Franco intended to do something illegal with her account information, and that in providing her information to Franco, she did not "intend to steal money from anybody."

### III.

### DISCUSSION

A. *The trial court did not err in allowing Quiroz to be prosecuted as an adult rather than as a juvenile*

Quiroz presents three related arguments challenging the trial court's handling of her case with regard to her age at the time of the offenses. Quiroz first contends that the court erred in refusing to hold a hearing to determine whether she was a minor at the time she committed the alleged offenses. She also contends that the trial court erred in failing to stay the criminal proceedings and transfer the case to the juvenile court because she was 17 years old when she agreed to sell her account information to a codefendant. She further asserts that, as a general rule, the juvenile court should have presumptive jurisdiction over cases in which the alleged criminal conduct begins when the defendant is a minor, even if the criminal conduct continues after the defendant's 18th birthday.

In challenging the trial court's refusal to hold a hearing as to her age and/or to transfer the case to the juvenile court, Quiroz relies on Welfare and Institutions Code section 604, subdivision (a), which provides: "Whenever a case is before any court upon an accusatory pleading and it is suggested or appears to the judge before whom the person is brought that the person charged was, at the date the offense is alleged to have been committed, under the age of 18 years, the judge shall immediately suspend all proceedings against the person on the charge. The judge shall examine into the age of the person, and if, from the examination, it appears to his or her satisfaction that the person was at the date the offense is alleged to have been committed under the age of 18 years, he or she shall immediately certify [the matter] to the juvenile court of the county . . . ." (Welf. & Inst. Code, § 604, subd. (a).)

■ The statutory basis for juvenile court jurisdiction over juvenile offenders derives from Welfare and Institutions Code section 602, subdivision (a), which states: "Except as provided in subdivision (b), any person who is under the age of 18 years when he or she violates any law of this state or of the United States or any ordinance of any city or county of this state defining crime other than an ordinance establishing a curfew based solely on age, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court." The burden of proving that the defendant was under the age of 18 at the time of the offense rests with the party seeking to establish that the defendant was a minor. (*People v. Nguyen* (1990) 222 Cal.App.3d 1612, 1618–1619 [272 Cal.Rptr. 523].)

Although the trial court did not hold a formal hearing as to Quiroz's age at the time of the offense, the court did examine evidence the defense presented, including Quiroz's birth certificate, and determined that some of the alleged overt acts in furtherance of the charged conspiracy had occurred after Quiroz had turned 18 years old. The record supports this conclusion. Quiroz, however, attempts to focus attention only on her overt act of agreeing to sell her information to Franco and turning the information over to him, which, according to Quiroz, occurred three days before she turned 18.

At the time Quiroz made her first request pursuant to Welfare and Institutions Code section 604, subdivision (a) in September 2005, the trial court implicitly accepted defense counsel's representation that Quiroz turned 18 on February 3, 2003. However, the court observed that, based on grand jury testimony, the People could amend the indictment to allege that the acts began on February 3, 2003, rather than on February 1, 2003, thereby

eliminating any issue as to Quiroz's age at the time of the offenses. The court also noted that even if Quiroz may have been a minor when she first became involved in the offenses, her involvement continued after she became an adult, stating, "[T]his is a situation in which we have continuing conduct. It is not as though one act took place when Ms. Quiroz was a minor and another act when she was an adult. The conspiracy charge is one of a continuing act or continuing conduct."

On October 28, 2005, Quiroz renewed her request for transfer to the juvenile court, and offered in evidence her birth certificate, which showed that she was born on February 3, 1985. The court took the matter under submission, and considered it again on October 31, just prior to trial. The court concluded: "I've had a chance to review all the paperwork, I've had a chance to review Welfare and Institutions Code Section 604, the laws of conspiracy, and all the facts that were presented. And what I have concluded, since there is no requirement that jurors unanimously agree as to which overt act occurred and which overt act was committed in furtherance of the crime, that fact is not a controlling factor, because the jury—I mean, the jury can make a determination that the overt acts that they're relying on occurred after February 3rd, just as well as they could make a finding that they may have occurred before. And since again they don't have to agree unanimously, I don't see it as an issue that warrants a suspension of criminal proceedings for an age determination. [¶] I'll take it at face value based on the evidence presented, the birth certificate, that the defendant was 18 on February 3rd, and I don't find that there is a legal impediment to the People's filing the amended, or seeking to amend by interlineation to amend the amended indictment."[3]

The trial court gave sufficient consideration to Quiroz's request regarding juvenile court, and clearly was not satisfied that Quiroz was a juvenile "at the date the offense [wa]s alleged to have been committed." (Welf. & Inst. Code, § 604, subd. (a).) The court did not err in concluding that if the jury could find that Quiroz was an adult at the time she committed any of the alleged crimes, then the trial court was not required to certify the case to juvenile court.

Quiroz also argues that the trial court erred in not transferring her case to juvenile court at some point during the trial because the evidence presented at trial demonstrated that she sold her account information to Franco before she

---

[3] The trial court allowed the prosecution to amend the indictment to allege that the charged offenses had occurred on or about February 3, 2003, through March 31, 2003.

turned 18. In rejecting two additional requests for transfer to juvenile court that Quiroz made during trial, the court reiterated that the jury was not required to agree unanimously as to what constituted the overt act necessary to establish a conspiracy. The court also noted that it was for the jury to determine whether the conspiracy was completed as soon as Quiroz provided Franco with her bank account and personal information, or rather, whether some later act completed the conspiracy.

■ Conspiracy "is the classic example of a continuing offense because by its nature it lasts until the final overt act is complete. [Citations.]" (*People v. Becker* (2000) 83 Cal.App.4th 294, 297–298 [99 Cal.Rptr.2d 354].) "The general rule is that a 'conspiracy usually comes to an end when the substantive crime for which the coconspirators are being tried is either attained or defeated.' [Citation.] '[An] insurance conspiracy would normally . . . terminate[] upon the receipt of the insurance proceeds.' [Citation.] 'It is for the trier of fact—considering the unique circumstances and the nature and purpose of the conspiracy of each case—to determine precisely when the conspiracy has ended.' [Citations.]" (*People v. Hardy* (1992) 2 Cal.4th 86, 143 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

■ In this case, uncontroverted evidence established that forged checks were deposited into Quiroz's account on February 18 and 20, 2003. The trial court thus correctly determined that the jury could have found Quiroz guilty of a conspiracy that continued at least until that time, which would mean that Quiroz would have been an adult during some portion of the conspiracy. The trial court thus did not err in allowing this case to proceed in the superior court rather than transferring it to juvenile court.

Quiroz argues in the alternative that even if her crime was a continuing one that began when she was a juvenile but continued after she reached the age of majority, this court should nevertheless conclude that it was error to try her as an adult. According to Quiroz, "[s]ocial policy, justice, and the Legislative purposes of the juvenile court system dictate that where a defendant is a minor during any part of her offense, the juvenile court should have presumptive jurisdiction in order to ensure the proper adjudication of the case."

■ Like the parties, we have found no reported California case that is directly on point on this issue. There are, however, a limited number of federal cases in which courts have concluded that a defendant charged with conspiracy may be tried as an adult if the defendant participated in the

conspiracy as an adult, even if the defendant was a minor when he or she first became involved in the conspiracy. (See *U.S. v. Thomas* (D.C. Cir. 1997) 324 U.S. App.D.C. 374 [114 F.3d 228, 238–239] ["a defendant charged with conspiracy may be tried as an adult even if he first became involved in the conspiracy while still a minor, so long as he continues to participate in the conspiracy after reaching the age of eighteen"]; *U.S. v. Strothers* (D.C. Cir. 1996) 316 U.S. App.D.C. 210 [77 F.3d 1389, 1392] [the Federal Juvenile Delinquency Act " 'does not . . . prevent an adult criminal defendant from being tried as an adult simply because he first became embroiled in the conspiracy with which he is charged while still a minor' "]; *U.S. v. Maddox* (6th Cir. 1991) 944 F.2d 1223, 1233 ["one who enters a conspiracy prior to his eighteenth birthday can be tried as an adult if he continues in the conspiracy after that time"].) Although these cases were decided under the Federal Juvenile Delinquency Act, which provides the statutory basis for juvenile court jurisdiction in the federal system, the underlying principle applies with equal force in this case. We hold that when a defendant's participation in a conspiracy begins while the defendant is a minor, but continues after the defendant's 18th birthday, the trial court is not required to transfer the case to juvenile court. Rather, the defendant may be tried as an adult.

Contrary to Quiroz's assertions, there is no sound policy reason for the juvenile court to have presumptive jurisdiction under these circumstances. In a case in which a defendant's participation in a crime begins while the defendant is a minor and continues after the defendant becomes an adult, that defendant has engaged in criminal conduct as an adult, and should not escape the consequences of that conduct simply because he or she first became involved in the conduct before reaching the age of majority.[4]

B.–E.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[4] Quiroz asserts that the reason California maintains separate court systems for adults and minors is to ensure that juvenile offenders receive treatment and rehabilitation, and that adult offenders receive punishment. Even assuming Quiroz's description of the purpose underlying our juvenile and adult criminal justice systems is accurate, such goals do not counsel in favor of presumptively treating as juveniles persons who engaged in a continuing crime while a minor and then as an adult. Those individuals chose to continue their criminal conduct as adults, and should face the consequences of such a choice.

[*] See foonote, *ante*, page 1420.

## IV.

## DISPOSITION

The judgment of the trial court is affirmed.

Huffman, Acting P. J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 13, 2008, S158397.