Filed 3/11/15  P. v. Choi CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B251616 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA095612) |
| v. | |
| KYUNG HWAN CHOI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George Genesta, Judge.  Affirmed.

Sunnie L. Daniels, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

Believing that Yoon Chan Han and his wife, Wan Chong Han, kept large sums of cash in their home, appellant Kyung Hwan Choi conspired with several others to steal the money. A first attempt to enter the home while the Hans were away failed. A few hours later, some of the conspirators (not including appellant) broke in and overpowered the Hans when they returned home from work. Finding no cash, they robbed the Hans of jewelry and personal items.

Appellant was charged with two counts of home invasion robbery (Pen. Code, § 211),[1] one count of assault with a stun gun (§ 244.5, subd. (b)), one count of first degree burglary (§ 459) with an allegation that a person other than an accomplice was present in the residence, making the crime a serious felony (§ 667.5, subd. (c)), and one count of conspiracy to commit first degree burglary, "person present" (§§ 182, subd. (a)(1), 459). He was tried twice. In his first trial (with codefendant Young Kim before separate juries), appellant's jury convicted him of the conspiracy and burglary charges, but deadlocked on the robbery and assault charges and a mistrial was declared as to those counts.[2] In his second trial, the jury convicted appellant of the robbery and assault charges, and found true an additional allegation that in committing the home invasion robberies he acted in concert with two or more persons (§ 213, subd. (a)(1)(A)). The trial court sentenced appellant to a total term of 13 years in state prison.

On appeal, appellant's contentions relate only to his convictions in the first trial: first degree burglary with a person present (§§ 459, 667.5, subd. (c)) and conspiracy to commit that crime (§ 182, subd. (a)(1)). He argues: (1) the trial

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

[2]     Young Kim's jury convicted him of one count of conspiracy and two counts of home invasion robbery, and acquitted him of the remaining charges. In B240492, we affirmed his judgment of conviction.

court violated his due process rights by failing to give a unanimity instruction regarding the conspiracy count, because the evidence showed two discrete conspiracies; (2) the evidence was insufficient to support the conviction of conspiracy to commit first degree burglary "person present," because appellant conspired to burglarize an unoccupied residence; and (3) the trial court's instructions on vicarious liability for the natural and probable consequences of conspiracy were fatally flawed, because they did not inform the jury that burglary of an unoccupied residence was a target offense of the conspiracy. We disagree with these contentions, and affirm the judgment.

## BACKGROUND[3]

*The Residential Robberies*

On November 2, 2010, at approximately 8:00 p.m., Yoon Chan Han and his wife, Wan Chong Han, returned to their home in Walnut from the golf shop they owned in Los Angeles. Mrs. Han went upstairs to the master bedroom, and Mr. Han went to the backyard to smoke a cigarette.

When Mr. Han opened the back door, two masked individuals pushed him back into the house. They hit and kicked him and shot him with a Taser or stun gun. Mr. Han fell to the floor, and the intruders tied his wrists behind his back with zip ties. One intruder searched the kitchen and asked Mr. Han in Korean, "Where's the money?" Mr. Han said he did not have any money.

Mrs. Han heard her husband yelling and was about to go downstairs when a man entered her bedroom and tied her hands together with zip ties. He asked her

---

[3] The evidence presented in both of appellant's trials was essentially the same. Because appellant's contentions pertain to the first trial, we focus primarily on the evidence in that trial.

3

in Korean, "Where's the money?" She did not respond. Mrs. Han heard someone ransacking her bathroom and closet. She heard one intruder speaking on the phone, saying that there was no money.

When the intruders went downstairs, Mrs. Han freed her hands, jumped off the balcony, ran to her neighbors' house, and asked them to call the police. Realizing Mrs. Han had escaped, the intruders quickly left. Mr. Han freed himself and called 911.

Los Angeles County Sheriff deputies recovered zip ties from the entryway of the house and found a mask and gloves on the sidewalk a few houses away. The robbers took a gold necklace, a Rolex watch, a ring, a wallet, and a cell phone.

*The Conspiracy*

Appellant's coconspirators in the crimes against Mr. and Mrs. Han were James Han, Young Kim, Andrew Kim, Alex Choi, David Chon, and Rene Hypolite. In our summary of the evidence, in order to avoid confusion regarding the conspirators with common surnames, we refer to them by their first names.

Co-conspirator Andrew Kim testified against appellant in exchange for a negotiated disposition in which he would plead guilty to conspiracy to commit first degree burglary and receive a probationary sentence. According to Andrew, in September or October of 2010, he was in a car with appellant, James Han, and Young Kim discussing ways to make money. In the conversation, James suggested committing a robbery or burglary. Appellant and Young said they knew of a potential victim. Young explained that this person kept a lot of money in his house. He and appellant had conducted a surveillance of the house to determine when the occupants left for work and the route they took between work and home. The original plan was to burglarize the home when no one was present.

4

According to Andrew, a few days later Young gave James a piece of paper on which (Andrew assumed) was written the address of the target home.  About a week before November 2, 2010, James had Andrew drive him to a house which, as other evidence showed, was the residence of Mr. and Mrs. Han.  James told Andrew to remember the house, and then threw away the piece of paper he had received from Young.

James recruited  David Chon, Rene Hypolite, and Alex Choi to join the conspiracy.  According to Andrew, James said that he, appellant, and Young would take half of the proceeds from the theft; the other half would be split among Andrew, Chon, Hypolite, and Choi.

On November 1, 2010, appellant, Andrew, Young, and James met at a Carl's Jr. parking lot to agree on the final plan.  They decided to meet there again at 10:00 the following morning.  At appellant's request, James drove appellant's car home after the meeting.

The next morning, November 2, 2010, Andrew drove James to the Carl's Jr. in appellant's car.  Appellant and Young arrived in Young's  car.  Appellant, Young, and James then left in Young's car to determine if the Hans were at work.

Andrew drove Chon, Hypolite, and Alex Choi in appellant's car to Mr. and Mrs. Han's house.  When they arrived, Andrew circled the block a few times, then stopped the car two blocks away from the house and let Chon, Hypolite, and Choi out of the car.  After five or 10 minutes, they returned to the car and said they were unable to get into the house.  Andrew drove the car around the neighborhood a few minutes and again stopped to let the three others out.  They returned, stating that they were unsuccessful again because a neighbor was outside.  By this time, it was about noon.

Andrew called James and told him about the two unsuccessful attempts. James told him to wait in a nearby parking lot. About an hour later, appellant, James, and Young arrived. Andrew told them that his group could not get into the house because there was a neighbor outside. He further said he wanted to drive back to Los Angeles and did not want to be the driver any more. They did not object, and Andrew then drove Chon, Hypolite, and Choi back to Los Angeles in appellant's car. During the drive, Chon said he wanted to go back and try again. Hypolite and Choi agreed. Andrew drove them to James' house. Shortly afterward, James returned to the house with appellant and Young. After a few hours, Andrew left the others to have dinner with his family.

Later that night, Andrew received a text from James stating that "they got into the house." Andrew met appellant, James, and Young in a parking lot, where James told him that nothing was found in the house other than jewelry. James gave the jewelry to Young who said he did not want it and gave it back. James said he knew a place to sell the jewelry.

*The Investigation*

In January 2011, Special Agent Charles Ro of the Federal Bureau of Investigation spoke to James while working in an undercover capacity in Las Vegas, Nevada. He later received information from Los Angeles County Sheriff's Department about the robbery of the Hans. On January 21, 2011, Agent Ro and his partner, still working undercover, spoke to appellant and Young at a nightclub in Las Vegas. The conversation was recorded. Appellant said he provided the Hans' address for the robbery. Appellant stated that he had paid an employee of the Hans' golf shop for information about the Hans' home and relayed that information to the crew who committed the home invasion robbery. He had been

6

told there would be about $200,000 in the home; however, the robbers found no money and took only personal valuables, including a Rolex watch.

Appellant told Agent Ro that James, someone named Rene (Hypolite's first name), and someone named "Tubo" (Chon's nickname) committed the robbery. James Han was the lookout and "Tubo" and Rene went inside the home. Appellant claimed to be James' mentor, and gave him opportunities to do work for him, including this robbery. Appellant had told James Han "to be more of a supervisor during the home invasion robberies." Later investigation showed that DNA on the ski mask found outside the Hans' home matched Hypolite's DNA profile.

Based on information from Agent Ro, Sergeant Steve Kim and Detective Thomas Yu of the Los Angeles County Sheriff's Department drove to Las Vegas, where they interviewed Hypolite, James, and Chon. Ultimately, appellant surrendered to authorities with his attorney.

## DISCUSSION

I. *Unanimity Instruction*

Appellant posits that the evidence showed two discrete conspiracies of which he might be guilty. The first discrete conspiracy was an agreement to steal money from the Hans' home while they were away at work – a plan that proved unsuccessful when Choi, Chon, and Hypolite could not gain entrance. The second separate conspiracy was conceived among Andrew, Choi, Chon, and Hypolite while they were driving back to Los Angeles, the object of which was to burglarize the Hans' home with the intent to commit robbery when the Hans returned from work. On the premise that there were two conspiracies, appellant contends that the trial court violated his federal due process rights by failing to give an instruction informing the jury that to convict appellant of conspiracy, it had to unanimously

agree on the particular conspiracy.  The contention fails, because there was only a single continuing conspiracy to take cash from the Hans' home, first by a burglary while the Hans were away, and later by a burglary with the intent to commit residential robbery.

"In a criminal case, a jury verdict must be unanimous." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)  "'Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime.  [Citation.]  Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act.'  [Citation.]  'When the prosecutor does not make an election, the trial court has a sua sponte duty to instruct the jury on unanimity.' [Citation.]" (*People v. Leonard* (2014) 228 Cal.App.4th 465, 491.)

"In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on *two discrete crimes* and not agree on any particular crime or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a *single discrete crime*.  [Citation.]  In the first situation, but not the second, it should give the unanimity instruction.  [Citation.]" (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 570.)

"There are cases that refer to a 'continuous-course-of-conduct exception' to the requirement of a unanimity instruction.  [Citation.]  . . .  [¶]  First, the continuous-course-of-conduct exception applies '"when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time" [citation].'  [Citation.]  . . .  [¶]  Second, the continuous-course-of-conduct exception applies when (1) 'the acts are so closely connected in time as to form part of one transaction,' (2) 'the defendant tenders the same defense or defenses to

8

each act,' and (3) 'there is no reasonable basis for the jury to distinguish between them. [Citations.]' [Citation.]" (*People v. Lueth* (2012) 206 Cal.App.4th 189, 196 (*Lueth*).) "[A] '"unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction."' [Citation.]" (*People v. Williams* (2013) 56 Cal.4th 630, 682 (*Williams*).)

Here, the continuous course of conduct exception applies. "Conspiracy 'is the classic example of a continuing offense because by its nature it lasts until the final overt act is complete. [Citations.]' [Citation.]" (*People v. Quiroz* (2007) 155 Cal.App.4th 1420, 1429.) "'A conspiracy is not necessarily a single event which unalterably takes place at a particular point in time when the participants reach a formal agreement; it may be flexible, occurring over a period of time and changing in response to changed circumstances.' [Citation.] 'The general test is whether there was "one overall agreement" to perform various functions to achieve the objectives of the conspiracy. [Citation.] Performance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a "single overall agreement." [Citation.] The general test also comprehends the existence of subgroups or subagreements.' [Citation.]" (*People v. Vargas* (2001) 91 Cal.App.4th 506, 553-554.) "Further, there may be 'a situation where a conspiracy will be deemed to have extended beyond the substantive crime to activities contemplated and undertaken by the conspirators in pursuance of the objectives of the conspiracy.' [Citation.]" (*People v. Gann* (2011) 193 Cal.App.4th 994, 1006.)

Here, the overarching conspiracy was to steal cash that the Hans supposedly kept at their home. The precise method to accomplish that overarching goal evolved in a period of about eight hours from a plan to enter while the Hans were absent, to a plan to enter and await the Hans' return so as to rob them. But that evolution does not mean that there were two separate conspiracies.

9

First, the change of plans from taking the money while the Hans were away to robbing the Hans in their home was part of a nearly seamless chain of events that occurred over a relatively short period of time. (*Lueth*, *supra*, 206 Cal.App.4th at p. 196; see *Williams, supra*, 56 Cal.4th at p. 682 [continuous conduct rule applied where the criminal acts "'took place within a very small window of time'"].) It was around noon on November 2 when Andrew called James and told him that Chon, Hypolite, and Choi were unable to enter the Hans' home. About an hour later, Andrew conveyed the same message in a meeting with appellant, James, and Young. Andrew also said he wanted to drive back to Los Angeles and not be a driver in the conspiracy. He then drove Chon, Hypolite, and Choi back to Los Angeles. During the drive, Chon, Hypolite, and Choi decided they wanted to try again. Andrew drove them to James' house, where they met with appellant and Young. After a few hours, Andrew left. The Hans were robbed around 8:00 p.m. that night. Sometime after that, Andrew received a text from James stating that "they got into the house."

Thus, the events leading to the change of plans were closely connected and occurred over no more than an eight-hour period. The chain of events was an evolution of a single conspiracy to steal money supposedly kept at the Hans' home, not two separate conspiracies.

Second, appellant did not offer different defenses to the purported separate conspiracies. Instead, his defense was that he was not involved in any conspiracy whatsoever. Thus, his attorney argued that appellant was not present when the Hans were robbed,[4] that there was insufficient evidence corroborating Andrew's

---

[4]    "There's no physical evidence that establishes that my client . . . was involved in this, there's no DNA linking [him] to this particular crime, there's no fingerprint evidence, and there's no surveillance."

10

testimony that appellant was a conspirator,[5] and that Agent's Ro's testimony concerning his undercover conversation with appellant was not trustworthy.[6] (See *Williams, supra*, 56 Cal.4th at p. 682 [applying the continuous conduct rule where the "defense was that he was not present at the scene of the crime and therefore played no role whatsoever in any of the crimes committed there"].) The defense presented no theory on which the jury might distinguish between a supposed conspiracy to steal money only when the Hans were away and a conspiracy to commit a residential robbery.

Third, like the defense argument, the evidence provided no reasonable basis for the jury to distinguish between the two purported conspiracies. All the same players were involved, and the object was the same -- stealing money kept at the Hans' house. (*Lueth, supra*, 206 Cal.App.4th at p. 196.) In short, because there was a single course of conduct emanating from a single conspiracy, no unanimity instruction was required. (*Williams*, *supra*, 56 Cal.4th at p. 682.)

Appellant contends that the jury may have been confused by the prosecutor's argument. During closing argument, the prosecutor argued that the conspiracy began as an agreement to commit a burglary and "morph[ed] into a robbery." But as we have explained, the "morphing" of the manner in which the conspirators

---

[5]     "There is no independent evidence to corroborate Andrew Kim's story. None. None. Not a telephone record. Not a police record. Nothing." "Why wasn't there one corroborating piece of evidence? . . . That's because Andrew Kim, James Han, David Chon, Rene Hypolite, Alex Choi, they did this crime. They planned it. . . . My client is innocent of any involvement in this crime." "Why would they blame my client as an alibi? To protect themselves."

[6]     "It makes me angry. The FBI special agent doesn't bring in the tape [of the entire conversation]." "Do you think that if that tape actually said what they said it said you couldn't have one of our interpreters . . . interpret what happened on the tape in Korean?"

11

decided to take the money supposedly kept at the Hans' house did not result in two different conspiracies.

Appellant also notes that he was charged with conspiracy to commit first degree burglary. Pursuant to CALJIC No. 6.23, the jury was properly instructed that he was "charged with conspiracy to commit the following public crimes: Burglary in violation of Penal Code section 459 [count] 4." However, the jury further was instructed pursuant to CALJIC No. 6.25 that he was "charged in Count[] 1 with *conspiracy to commit the crime of robbery, in violation of . . . section 211*, and the crime of burglary, in violation of Penal Code, section 459. [¶] In order to find the defendants guilty of the crime of conspiracy, you must find beyond a reasonable doubt that the defendants conspired to commit one or more of the crimes, and you also must unanimously agree as to which particular crime or crimes . . . they conspired to commit. [¶] If you find the defendants guilty of conspiracy, you will then include a finding on the question as to which such alleged crimes you unanimously agree the defendant conspired to commit. A form will be supplied for that purpose for each defendant."[7]  (Italics added.)

While we agree that CALJIC No. 6.25 as given erroneously stated that appellant was charged with conspiracy to commit robbery, there was no prejudice concerning the unanimity requirement. The jury unanimously convicted appellant of both first degree burglary and conspiracy to commit first degree burglary. Thus,

---

[7]  The Use Note for CALJIC No. 6.25 provides: "This instruction is designed for use where it is charged that defendant conspired to commit two or more felonies and the commission of such felonies constitute but one offense of conspiracy." The jury was not provided with the form referred to in the instruction. Instead, the verdict form merely allowed the jury to find appellant guilty of the crime of conspiracy to commit first degree burglary with person present in violation of Penal Code section 182, subdivision (a)(1).

12

the erroneous mention of conspiracy to commit robbery does not suggest that the jury failed to unanimously agree in its conspiracy verdict.

II.    *Sufficiency of the Evidence to Support Conspiracy Conviction*

So as to make the first degree burglary with which appellant was charged a serious felony, the information alleged in the burglary count that a person other than an accomplice was present in the residence when the crime was committed (§ 667.5, subd. (c)).  Similarly, referring to the burglary charge, the conspiracy charge alleged a conspiracy to commit first degree burglary, "person present."  As we have noted, the jury convicted appellant of both crimes.

Appellant contends, in substance, that the evidence was insufficient to support the conspiracy conviction, because he agreed only to steal money while the Hans were away, not to the commission of home invasion robbery.  He is wrong.  Of course, "[w]hen the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'  [Citation.]  Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction.  [Citation.]"  (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

Here, the evidence was more than sufficient to prove that appellant agreed to the robbery of the Hans.  Appellant was the primary moving force behind the plan

13

to take money from the Hans' home, believing that $200,000 would be found there. The initial plan to have Chon, Choi, and Hypolite enter the Hans' residence while the Hans were away failed. Thereafter, on the way back to Los Angeles, Chon, Choi, and Hypolite decided they wanted to try again. Andrew drove them to James' house, where they met with James, appellant and Young. Later that evening, after that meeting, the robbery of the Hans occurred. Andrew received a text from James stating that they had gotten into the house. Andrew met with Young, James, and appellant in a parking lot where the robbery was discussed and the loot displayed.

This evidence alone – that appellant was a moving force in planning to take money from the Hans' house, his presence with the other conspirators in the hours before the robbery when the idea for the robbery was presumably hatched, and his presence after the robbery when the robbery was discussed and fruits displayed – is evidence that he was a full participant in the plan to rob the Hans.

This conclusion was reinforced by the testimony of Agent Ro. Appellant told Agent Ro details about the crime that suggested intimate knowledge of the crime. He said that James, Rene (Hypolite's first name), and "Tubo" (Chon's nickname) committed the robbery. James was the lookout and "Tubo" and Rene went inside the home. Appellant claimed to be James' mentor, and gave him opportunities to do work for him, including this robbery. Appellant had told James "to be more of a supervisor during the home invasion robberies."

From all of this evidence, the jury could reasonably infer that appellant was a full participant in the agreement to rob the Hans. Indeed, it is difficult to believe that James, Choi, and Hypolite would have committed the robbery without his agreement.

14

III. *Natural and Probable Consequences Doctrine*

The trial court instructed the jury on the vicarious liability of coconspirators for the natural and probable consequences of acts committed to further the object of the conspiracy.[8] Appellant contends, in substance, that the trial court should have informed the jury that a burglary of the Hans' residence *while they were absent* was a target offense of the conspiracy, so as to assist in determining whether the charged burglary of the Hans' residence *while they were present* (the burglary of which he was convicted) was a natural and probable consequence of the conspiracy. According to appellant, that error requires reversal of his burglary conviction.

The short answer to appellant's contention is that the trial court's duty to identify and describe target crimes "arises only when '*uncharged* target offenses form a part of the prosecution's theory of criminal liability and substantial evidence supports the theory.' [Citation.]" (*People v. Valdez* (2012) 55 Cal.4th 82, 152.) Where the prosecution's theory of liability relies on uncharged target offenses, "an instruction identifying and describing potential target offenses is necessary to minimize the risk that the jury, generally unversed in the intricacies of criminal law, will 'indulge in unguided speculation' [citation] when it applies the law to the evidence adduced at trial" in determining whether the charged crime is a

---

[8]     Pursuant to CALJIC No. 611, the trial court instructed the jury in relevant part: "A member of a conspiracy is not only guilty of the particular crime that to his [or] her knowledge his [or] her confederates agreed to and did commit, but is also liable for the natural and probable consequences of any crime [or] act of a co-conspirator to further the object of the conspiracy, even though that crime [or] act was not intended as a part of the agreed upon objective and even though he [or] she was not present at the time of the commission of that crime [or] act. [¶] You must determine whether the defendant is guilty as a member of a conspiracy to commit the originally agreed upon crime or crimes, and, if so, whether the crime alleged in Counts 2, 3, 4 was perpetrated by a co-conspirator[] in furtherance of that conspiracy and was a natural and probable consequence of the agreed upon criminal objective of that conspiracy."

15

natural and probable consequence.  (*People v. Prettyman* (1996) 14 Cal.4th 248, 267.)

Here, appellant was specifically charged with conspiracy to commit first degree burglary "person present," and the jury convicted him of that charge.  It also convicted him of the object of the conspiracy:  first degree burglary with a person present.  Appellant's guilt of that burglary was not predicated on the theory that it was a natural and probable consequence of an intermediate target offense, but rather on the theory that it was the specific, charged object of the conspiracy.  Therefore, the trial court had no duty to instruct on any target offense.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.



We concur:



EPSTEIN, P. J.                    COLLINS, J.