Filed 11/23/22  P. v. Serna CA1/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SALVADOR SERNA,<br><br>    Defendant and Appellant. | A164252<br><br>(Tulare County<br>Super. Ct. No. VCF340403) |

Defendant Salvador Serna was charged in separate criminal cases of committing sex offenses against two child victims, one was his younger niece and the other was an unrelated adolescent girl who contacted him through social media.  After the two cases were consolidated, he was convicted by a jury of all charges brought against him:  three counts of committing a lewd act upon a child under the age of 14 (his niece) (Pen. Code, § 288, subd. (a))[1] and one count of contacting a minor with the intent to commit a sexual offense (§ 288.3, subd. a).  He now appeals, raising several claims of procedural and evidentiary error affecting the trial, and one sentencing error.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

We affirm the judgments of conviction, but remand for resentencing because the trial court failed to state its reasons for imposing the maximum sentence.

## BACKGROUND

### A. The Lewd Touching Case Involving Defendant's Young Niece

In December 2015, defendant's 11-year-old niece B., who is 10 years younger than him, revealed to her mother and older sister that defendant had molested her. The disclosure was precipitated by the discovery that B. had been watching pornography on a tablet. When her mother confronted her about this and threatened her with punishment unless she revealed who had made her watch pornography, B. responded that it was defendant.[2] Then, scared and crying, she also said he had molested her. She had been keeping it in, afraid to tell anyone. Upon hearing this, her sister E., who is seven and a half years older than B., revealed for the first time to her family that defendant also had touched her inappropriately when she was younger.

A few days later, B.'s revelations were reported to police. In an interview with a trained forensic child interview specialist for the district attorney's office, the 11 year old described the details of defendant fondling her body on multiple occasions. Defendant would have been around 20 years old at the time she said he did this. She told the investigator it had all taken place at her grandparents' house (where defendant also lived), behind closed doors in defendant's bedroom, starting when she was around 9 years old and ending in March 2015 when she was 10 (i.e., about 10 months before she revealed it), after he got a girlfriend. She described how she had reacted,

---

[2] There was conflicting testimony as to whether she revealed this information the same day the pornography came to light, or whether it happened over the course of two days.

2

saying she tried to kick him and stop him. The first time, which happened when her relatives were outside in the backyard, he asked her to get something from his bedroom, followed her inside, closed the door behind him and then, without saying a word, lifted her shirt and began touching her bare breasts. She pushed him away and ran out of the room to the front of the house where she saw one of her cousins and said defendant had tried to rape her.[3] He did the same thing another time, and again she pushed him away. Another time he touched her bare buttocks with his hands. And another time he slipped his hands down her pants and fondled her vagina, "in between [the] line where the skin separates a little bit." She also told the investigator that once he made her watch pornography on a website through his phone, telling her "you should probably watch more of this." Later at trial, she would elaborate that he would lure her into his bedroom by tricking her, such

---

[3] Later, at trial she identified the cousin by name (A.), whom she said she told about the molestation sometime later on, after the first incident. According to information contained in some of defendant's pre-trial filings, she also told her parents she thought defendant had touched her cousin A. inappropriately as well, and, according to her mother and sister who confronted A. about this, the cousin cried and confirmed defendant had done so. But the cousin recanted that accusation when interviewed (twice) by the same law enforcement child interview specialist who spoke with B.; the interviewer did not believe the cousin's retraction was truthful; and the trial court granted defendant's motion in limine to exclude all evidence of the cousin's recanted accusations, including the investigating interviewer's doubts about the truthfulness of her recantation. The People did not oppose the motion, and the court said it would allow the prosecution to revisit the issue if need be for rebuttal purposes. The issue did not arise at trial, and that was the end of the matter. The trial court also granted an unopposed motion to exclude evidence that yet another (unidentified) cousin living out of state had told E. that defendant had touched her inappropriately as well, an accusation police apparently did not investigate.

3

as by telling her he would give her candy or play a game with her, and that sometimes he told her to keep his behavior a secret.

## B. The Texting Case Involving an Unrelated Child Victim

In November 2015, about a month before B.'s revelations about her uncle came to light, he carried on a flirtatious text exchange with a 12- or 13-year-old eighth-grade girl named Y., that became sexually explicit. Y. was the sister-in-law of one of his friends, had seen him on Facebook through family connections and wanted to be in a relationship with him. She initiated contact with him, by reaching out to him through text using the phone number listed on his Facebook page.

Over the course of their communications, defendant asked Y. to send him pictures of herself, told her things like "[s]end me a nude and I'll call you babe," and often egged her on by calling her a "little girl" whenever she refrained from complying with his requests for nude pictures of herself. He also made sexually explicit comments to her. For example, once when she texted to ask if he was asleep he offered to "bet you a blowjob" he wasn't sleeping, and another time he told her "I want to take you down so bad" which she took to mean he wanted to do something sexual, and then made a crude comment about her vagina ("I bet you have it all tight"). Another time he asked, "[w]hen are you going to let me have sex with you?" Another time he said, "[s]ee when you can escape," which she understood as a request to sneak out of her house to meet him.

During this period, the two would occasionally see each other at rodeos but never approached each other or talked. By text, she would sometimes make comments to him about how he wouldn't say hi to her at the rodeo, or about seeing him there dancing with other people. She also complained he sometimes didn't text her back.

4

At his request, Y. did send him photographs of herself. Their exchanges culminated when she finally relented to his repeated requests for a more explicit photograph and sent him a nude photograph of her vaginal area. After she did that, he just stopped replying to her texts and had no further contact with her. The two never met in person.

## C. Criminal Proceedings

Defendant was charged in two separate cases that were later consolidated for trial over his objection. In one case, he was charged with four counts of committing a lewd act upon a child under 14 during the two-year period between September 29, 2013, and September 28, 2015 (§ 288, subd. (a)). Attached to one count, concerning the vagina touching, was a special allegation he had engaged in substantial sexual conduct (see § 1203.066, subds. (a)(8), (b) [defining same]). In the other case, he was charged with one count of contacting a minor with the intent to commit a sexual felony, during a 10-day period in November 2015.

The cases proceeded to a four-day jury trial in May 2019. At trial, defendant moved in limine unsuccessfully to sever the charges, which we discuss in greater detail below. The sole witness in the texting case was the complaining witness, Y. In the lewd touching case, there were four witnesses: defendant's niece, B., who by then was 14 years old and testified very briefly about the molestation and her disclosure of it to her mother and sister; the criminal investigator who took her statement in December 2015, who principally authenticated a copy of the interview transcript and testified about the circumstances (not the substance) of the interview; her mother, who testified about the child's revelation[4]; and her older sister E., who

---

[4] At trial, both B. and her mother denied that her mother threatened to hit her if she didn't reveal who had been showing her pornography, but her

testified not only about B.'s revelation of the molestation but also, over the defendant's objection, about her own experience several years earlier when defendant had subjected E. to unwanted touching when she and her uncle were adolescents, a fact she had kept secret for many years. We discuss that testimony below.

In her testimony at trial in the lewd touching case, B., who was then 14 years old, diverged from the accounts she had given three and a half years earlier in two principal ways. First, she recanted her prior statement (made both to her mother and sister and then, later, in her law enforcement interview in December 2015), that defendant had shown her pornography. When questioned on direct examination, she took the prosecutor by evident surprise when she haltingly revealed she had lied about that. The truth was, she testified, that she had found pornography on her own and began to watch it because "[w]hat happened to me just got stuck in my head." At first, she testified she didn't know why she had lied to her mother but then testified she blamed her pornography watching on defendant "[b]ecause I needed to tell [my mother] what happened and that was the way I told her." She revealed the molestation to her family because she was "turning depressed."

B.'s second inconsistency at trial with her earlier statements concerned the timing of the molestation. Whereas three and half years earlier she had reported to the investigator in her interview when the issue came to light that the molestation began "[w]hen I was probably like nine years old," she testified at trial that it began when she was six years old and she could not recall when it ended. On the basis of this three-year discrepancy, defendant made a number of motions to suspend and/or dismiss the criminal

mother told the detective in December 2015 she had threatened to hit her daughter if her daughter did not say who it was.

6

proceedings, all premised on the theory the prosecution had not established defendant was an adult at the time of the charged molestation. We discuss that issue further below.

The jury deliberated for around seven hours over the course of two court days, submitted two requests to review evidence and one question,[5] and returned a verdict finding defendant guilty on all counts and finding true the special allegation he had engaged in substantial sexual conduct when he touched B.'s vagina. Defendant was sentenced to an aggregate prison term of 14 years and four months, and this timely appeal followed.

## DISCUSSION

### I.

### *Joint Trial of the Two Criminal Cases*

Defendant argues, first, that the trial court abused its discretion when it consolidated his two cases and then denied his motion to sever them for trial. We do not agree.

The legal standard is well-settled. "The law prefers trying charged offenses together because doing so ordinarily promotes efficiency," a preference that is embodied by section 954 of the Penal Code. (*People v. Anderson* (2018) 5 Cal.5th 372, 388.) It states in relevant part that, "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." (§ 954.) If joinder is proper, the court in its

---

[5] The jury asked for the transcript of B.'s forensic interview, and the next day was given the transcript and watched the video of the interview. A short time later, it requested and was given a readback of B.'s trial testimony and asked if a separate vote was required for the special allegation in count 1.

discretion may still order the counts tried separately. (*Anderson*, at p. 388; see also § 954 ["the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately"].)

Our review of the trial court's ruling is deferential. When the statutory requirements for joinder are met, "the defendant must make a clear showing of prejudice to demonstrate that the trial court abused its discretion." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 746 (*Holmes*); accord, *People v. Johnson* (2015) 61 Cal.4th 734, 750.) That "clear showing of prejudice" standard, which applies both to a claim the trial court erred in ordering consolidation and to a claim it erred in denying severance, requires the defendant to "establish that the ruling fell ' " ' " 'outside the bounds of reason.' " ' " ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 37 (*Merriman*).) "In reviewing such a ruling, we consider: '(1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.' " (*Holmes*, at p. 746.) "An appellate court evaluates such claims in light of the showings made and the facts known by the trial court at the time of the court's ruling." (*Merriman*, at p. 37.) "A defendant seeking severance of properly joined charged offenses must make a stronger showing of potential prejudice than would be necessary to exclude evidence of other crimes in a severed trial." (*People v. Simon* (2016) 1 Cal.5th 98, 123 (*Simon*).)

On appeal, defendant does not argue that the two cases were ineligible to be joined under section 954, and so we will assume that they are statutorily eligible to be consolidated (as involving "different offenses of the same class of crimes or offenses"). His only argument is that application of the relevant legal factors "compel[s] the conclusion that joining these cases resulted in undue prejudice and denial of a fair trial." But a defendant "bears a heavy burden to overcome the preference for a single trial of properly joined counts." (*Merriman, supra*, 60 Cal.4th at p. 42.) Defendant has not analyzed and applied any caselaw where error was found and has not met that heavy burden. Considering each factor ourselves based upon the record at the time of the court's rulings, we find no clear showing of prejudice sufficient to establish an abuse of discretion.

*First*, the parties raise numerous issues and theories as to whether evidence of the lewd touching charges would be admissible in a separate trial of the texting charge and vice versa, but it is necessary to comment here only briefly. At a minimum, evidence of defendant's conduct toward B. was cross-admissible in the texting case—specifically, on the issue of intent.[6]

---

[6] The trial court did not expressly rule on whether there would be cross-admissibility. When it consolidated the two cases, it stated it was "not basing this decision on whether or not there's cross-admissibility on the two cases." And in denying defendant's motion to sever the charges, the court did not clearly state its views on the subject either. At that later juncture, it said nothing as to whether evidence of the lewd touching case would be admissible in a separate trial of the texting case, or vice versa. It merely expressed some uncertainty about cross-admissibility in the event of a *guilty plea* in the texting case. Specifically, when defense counsel inquired about the potential impact of a guilty plea to the texting charge, it questioned whether evidence of the texting conduct would still be admissible in the lewd touching case, made comments suggesting that it would be admissible despite a guilty plea if his defense in the lewd touching case was "refuted" by the evidence in the

9

Evidence Code section 1101, subdivision (b) allows "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." A central contested issue in the texting case was defendant's intent. As the People point out, this was an element of the offense defense counsel expressly challenged in closing argument ("The second issue [in the texting case] is whether the evidence proves a specific intent on his part . . ."). We agree with the People that evidence defendant had previously engaged in criminally lewd or lascivious acts toward B. (§ 288) helped prove he intended to do the same with Y. when he was texting with her, and this was a theory of admissibility specifically argued to the trial court in opposing defendant's request to sever the charges.

Defendant argues his conduct in the two cases was too dissimilar to be probative of his intent in either one but cites no authority suggesting a trial court would have *no* discretion to conclude they were sufficiently similar to be probative of his mental state in the texting case. He simply asserts that "if a generic sexual interest in minors is sufficient for section 1101 purposes, then Evidence Code section 1101 would permit all sexual offenses against minors to prove any sexual offenses against other minors. This cannot be the law." The short answer is that, for the most part, it is the law: Evidence Code section 1108 permits this for many, if not most, sexual offenses, but for the

texting case, but ultimately asked for briefing on the impact of a guilty plea on admissibility and never returned to the subject.

10

constraints otherwise imposed by Evidence Code section 352.[7] More to the point, at issue here is not evidence of defendant's "generic sexual *interest* in minors" but rather his actual sexual *conduct* toward B., a child or very young adolescent, which a trial court reasonably could conclude is probative of his intentions in carrying out a lurid text exchange with another young adolescent in which, among other things, he specifically solicited her (twice) to engage in sexual conduct with him.

"The least degree of similarity is required to prove intent. All that is needed is for the crimes to be sufficiently similar to support an inference that the defendant probably had the same intent each time." (*People v. Anderson*, *supra*, 5 Cal.5th at p. 389 [upholding joinder of charges].) Evidence defendant *actually* engaged in lewd acts with B. supports an inference he had an *intent* to do the same with Y. when he sexually propositioned her. In arguing otherwise, defendant stresses various factual differences in the circumstances of each situation (one, involving a family member and the other a complete stranger who initiated contact with him); but he does not explain how those factual distinctions undermine an inference he had the same sexual intent in each case, and we perceive no basis to draw such a distinction. At most, the differing circumstances might affect the weight a

---

[7] That statute provides an exception to the general prohibition on propensity evidence under Evidence Code section 1101 in any "criminal action in which the defendant is accused of a sexual offense," for "evidence of the defendant's commission of another sexual offense or offenses," provided that such evidence "is not inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a).) It defines "sexual offense" to include many offenses against minors including violation of section 288 (see Evid. Code, § 1108, subd. (d)), but does not list section 288.3, and the parties disagree as to whether it would permit introduction of the evidence of defendant's texting conduct in a trial of the lewd touching charges concerning B. We do not reach that issue.

11

jury in the texting case would give to evidence of his conduct toward his niece, B., in deciding whether he had an intent to engage in sexual conduct with Y., but they do not affect its admissibility. He cites no authority suggesting that in a trial of the lewd texting charge, a trial court would have *no* discretion under Evidence Code section 1101 to admit evidence of his lewd conduct toward his niece.

Because evidence of the lewd touching would be admissible in a separate trial of the texting charge, it is unnecessary to consider whether the opposite is true (that is, whether evidence of the texting conduct with Y. would be admissible in a separate trial of the lewd touching charges involving B.), or any other factor. For joinder purposes, it is sufficient to dispel any inference of prejudice if evidence supporting one offense would be admissible in a separate trial of the other charge. " ' "[T]wo-way" cross-admissibility is not required.' " (*Merriman*, *supra*, 60 Cal.4th at p. 38.) The Supreme Court has said this principle is "clear": "In other words, it may be sufficient, for example, if evidence underlying charge 'B' is admissible in the trial of charge 'A'—even though evidence underlying charge 'A' may not be similarly admissible in the trial of charge 'B.' " (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221.) The fact that defendant's conduct toward B. would have been cross-admissible in the texting case is a sufficient and dispositive basis upon which we can and must affirm the court's exercise of discretion to deny severance of the charges. (See, e.g., *Merriman*, *supra*, 60 Cal.4th at p. 42 [no abuse of discretion in refusing to sever trial on multiple counts of sexual assault against two women victims from trial on unrelated murder charge involving third victim; "Because the sexual assaults evidence clearly would have been cross-admissible in a separate trial of the murder count,

12

that circumstance alone is sufficient to dispel any potential of prejudice arising from the joinder of these counts . . ."].)

Second, and in any event, we would affirm the court's rulings allowing the cases to be tried jointly even if the evidence in each case would have been *inadmissible* at a separate trial in the other. "Cross-admissibility is not . . . a precondition to joinder of charges. '[S]ection 954.1 expressly provides that "where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning the one offense or offenses *need not* be admissible as to the other offense or offenses before the same trier of fact." (Italics added.) Thus, "cross-admissibility is not the sine qua non of joint trials." ' [Citation.] While the presence of such evidence ' "is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges" ' [citation], *the absence of cross-admissible evidence does not bar joinder*." (*People v. O'Malley* (2016) 62 Cal.4th 944, 968, italics added.) So, for example, in *People v. Bean* (1988) 46 Cal.3d 919, the Supreme Court upheld the denial of a severance motion even though there was no cross-admissibility, because "[t]his is not a case in which, at the time the ruling was made, the evidence of defendant's guilt of one or more of the joined offenses was weak, while evidence of the other was strong. And neither offense was particularly inflammatory in comparison with the other." (*Id.* at p. 939, fn. omitted; see also, e.g., *Simon, supra,* 1 Cal.5th at pp. 123-131 [upholding joint trial of unrelated homicide charges despite absence of cross-admissibility]; *People v. Thomas* (2012) 53 Cal.4th 771, 799 [same].)

The same is true here. In this case, there was not a great disparity in the inflammatory nature of the two sets of charges. Although the charges concerning the touching of B. involved attention that was unwanted and

actual physical contact, defendant's communications, albeit initiated by Y., were lurid, graphic and actively solicitous of her, and a jury could find they reflected a desire to engage in conduct with her and were as disturbing as the physical groping of B. Among other things, defendant propositioned Y. to have sex with him, asked her to send him nude pictures of herself and made crude comments expressing his desire to have sexual contact with her. A jury could reasonably conclude that, but for the fact he apparently lost interest in pursuing his avowed urges regarding Y., he might well have molested her, too. In these circumstances, "we cannot say that the charges [in the groping case] were *particularly likely* to inflame the jury against defendant" [in the texting case]. (*People v. Thomas, supra,* 53 Cal.4th at p. 799, italics added [finding no error in refusing to sever two sets of murder charges, even though one set of murders was more callous and "may have" had potential to inflame the jury]; see also, e.g., *Holmes, supra,* 12 Cal.5th at p. 747 ["[T]he incidents were 'different in their particulars,' but 'equally abhorrent' "].)

Moreover, at the time of the court's ruling denying severance, neither case appeared to be a weak one that was bolstered by joining it with a stronger one, and we do not understand defendant to contend otherwise on appeal. Indeed, defendant never asserted below that one case was significantly stronger than the other.[8] Moreover, the nature and substance of defendant's texts to Y., which the trial court reviewed when it considered the severance motion, were undisputed; and his intent to commit a sexual offense with Y. was evidenced by the undisputed content of the communications themselves. Likewise, testimony by a sheriff's deputy at the preliminary

---

[8] Defendant never made any argument to the trial court about the relative strength of the two cases—neither when opposing the prosecution's consolidation motion, nor when he asked the trial court to sever the charges.

hearing reflected that B. had given a relatively detailed account to the forensic interviewer of how defendant had molested her. There was simply no basis for the court to conclude, when it denied severance, that one case was likely to be considerably stronger (or weaker) than the other. (See, e.g., *Holmes*, *supra*, 12 Cal.5th at p. 747 [affirming denial of severance where there was "strong evidence" in both cases].) "The core prejudice concern arising in connection with this issue is that jurors may aggregate evidence and convict on weak charges that might not merit conviction in separate trials. [Citation] This concern is especially pronounced when evidence of a lesser but inflammatory incident might be used to bolster a weak prosecution case as to another incident. [Citation.] But even where evidence from one incident could be considered 'inflammatory' as the term is understood in our case law [citation], we will find no abuse of discretion if the evidence of guilt for each of the joined incidents is sufficiently compelling. [Citation.]" (*Simon*, *supra*, 1 Cal.5th at p. 127 [affirming denial of severance].) That is true here.

For all of these reasons, we conclude the trial court did not abuse its discretion in proceeding with a joint trial on all of the charges.

We also reject defendant's related contention that the joint trial violated his federal constitutional right to a fair trial. "Even when we conclude, as we do here, that the trial court acted well within its discretion in denying severance or consolidating charges, we must further inquire whether events *after* the court's ruling demonstrate that joinder actually resulted in 'gross unfairness' amounting to a denial of defendant's constitutional right to fair trial or due process of law." (*Merriman*, *supra*, 60 Cal.4th at p. 46.) "[A] judgment will be reversed on this ground only if it is

15

'reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt.' " (*Id*. at p. 49.)

However, in this case defendant offers only a perfunctory analysis of the constitutional issue and fails to argue that any event that occurred after the in limine ruling demonstrates that joinder resulted in unfairness. Instead, his due process argument is a reprise of his challenge to the consolidation ruling attacking the cross-admissibility of the evidence. He contends "[t]he jury heard inflammatory evidence as to each charge that was totally unrelated to the other charge" and "[c]ombining these two counts significantly bolstered the likelihood of guilty findings in both cases." More specifically, he contends the lewd touching charges would have unduly inflamed the jury and led it to draw negative inferences about his character that would cause it to convict him on the texting charges, and that the converse is also true.

We find these arguments unpersuasive for the reasons we have already discussed. We have already rejected defendant's argument that the lewd conduct and texting charges were, as defendant puts it, "totally unrelated" to each other, because the lewd conduct charges were relevant to the contested issue of defendant's intent in committing the texting offense. And we have concluded that neither the lewd conduct nor the texting charges was as significantly more inflammatory than the other and that neither case was significantly stronger or weaker than the other. Thus, there is no likelihood that the jury would have convicted the defendant of either the lewd conduct offenses or the texting offense simply because it found his conduct on the other offense or offenses abhorrent. This is especially so because, in addition to the instructions on the elements of the various offenses, the jury was instructed that "[e]ach of the counts charged in this case is a separate crime"

16

and told to "consider each count separately." In short, defendant fails to persuade us that any gross unfairness resulted from trying the charges arising out of the two kinds of conduct together.

## II.

### *Evidence of Uncharged Sexual Offenses*

#### A. Background

Following an initial in limine hearing, the trial court ruled that E., defendant's other niece and older sister of complaining witness B., would be permitted to testify about defendant's unwanted touching of her as well. That uncharged conduct took place around eight years earlier than the incidents involving B., when defendant and E. were both children who played together at the home where defendant lived with his parents, who were her grandparents. Over defense counsel's objection, the court ruled that E.'s testimony was admissible under two exceptions to the general prohibition on propensity evidence (see Evid. Code, § 1101): under subdivision (b) of section 1101, and under section 1108.

Defense counsel later filed a supplemental motion in limine contending that because defendant was a minor when the unadjudicated conduct took place, the uncharged conduct was inadmissible unless, outside the jury's presence, the prosecution rebutted by clear and convincing evidence the statutory presumption that he lacked criminal capacity to commit a sexual offense (see generally § 26; *People v. Cottone* (2013) 57 Cal.4th 269). Following an Evidence Code section 402 hearing conducted outside the jury's presence at which E. testified, the court found by clear and convincing evidence defendant "knew what he was doing was wrong and inappropriate," and again ruled the evidence was admissible under Evidence Code sections 1101, subdivision (b) and 1108.

17

E. then testified at trial. Her testimony about the uncharged conduct occupied about 8 pages of her 23-page testimony (i.e., around 25 percent); by comparison, B.'s testimony occupied about 20 pages, their mother's testimony occupied about 13 pages, and Y.'s testimony concerning the texting about 32 pages.

In relevant part, E. testified that when she was nine years old, defendant touched her breast and vaginal areas over her clothing multiple times. Based on their birthdays, the jury could infer he was about three years older than E. (two years and eight months, to be precise) and therefore about 12 years old when he groped E. The jury could likewise infer that the incidents involving E. took place in 2001 or early 2002, about seven and a half years before B. told the forensic interviewer defendant had begun molesting her at age nine, and more than a decade before B.'s accusations came to light in December 2015.

E. could recall only the specifics of two incidents, but she testified there were more. She remembered that one time he touched her while she was walking down the hallway at her grandparents' home when nobody else was around, that he didn't say a word and that she didn't know what to do. The other time she remembered, the two were playing outside together with some cousins at her grandparents' house and he told her they would play a game. She followed him into a van that was parked outside the home, and he again touched her inappropriately over her clothes in her breast and vaginal areas. She felt confused and scared, and didn't know what to do or how to make it stop. She didn't tell anyone right away because defendant had told her not to tell anyone. She first told someone in 2015, which was many years later but before she had learned of her sister's accusations. The person she told was a boyfriend. She finally decided to tell her parents about defendant's behavior

18

toward her when her younger sister B. disclosed what defendant had done to her, and a sense of guilt weighed on her for not having spoken up long before then. After her sister's disclosures, E. accompanied their father and brother to their grandparents' house where they confronted defendant. He repeatedly denied that he had ever touched either girl inappropriately. But eventually, after E. repeatedly asked him to admit he had touched her inappropriately, he said that "we were little" and "we were just playing games." E. testified it had not been a game to her, and she had not wanted him to do that to her.

Defendant now challenges the admission of E.'s testimony about defendant's uncharged conduct toward her on several grounds. He contends the court erred in admitting it because: (1) there was insufficient evidence to support a finding by clear and convincing evidence that he knew his conduct was wrong, as required to establish he had the capacity despite his age to commit a criminal offense, and there was insufficient evidence he possessed lewd intent which is an element of the underlying sexual offense[9]—both rendering the testimony inadmissible under section 1108; (2) the evidence was inadmissible propensity evidence of his character, barred by Evidence Code section 1101 because no exception under subdivision (b) of that statute applied; (3) the evidence should have been excluded under Evidence Code section 352 because its prejudicial impact exceeded its probative value; and (4) its admission rendered his trial fundamentally unfair in violation of his federal due process rights.

---

[9] He also argues the uncharged conduct was inadmissible under section 1108 because it had no tendency in reason to prove he had the propensity to lewdly touch a child when he was an adult.

Reviewing the trial court's evidentiary rulings for abuse of discretion (see *People v. Dworak* (2021) 11 Cal.5th 881, 899; *People v. Picazo* (Oct. 25, 2022, A161621), 84 Cal.App.5th 778 [2022 WL 14403798, at p. *17] (*Picazo*)) we find none. We do not reach most of defendant's state law arguments, because the trial court did not abuse its discretion in ruling the evidence was admissible under Evidence Code section 1101, subdivision (b) as evidence of a common scheme or plan, nor in rejecting defendant's argument the evidence should have been excluded under Evidence Code section 352. We also reject his federal constitutional claim. Because we conclude the trial court did not err in admitting the evidence under Evidence Code section 1101, subdivision (b), we need not reach the question whether it erred in admitting it under section 1108.

## B. Analysis

### 1. Evidence Code Section 1101, Subdivision (b)

As we have noted, Evidence Code section 1101, subdivision (b) makes admissible "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact" other than a person's disposition to commit the act, including to prove the existence of a "plan." (Evid. Code, § 1101.) "Evidence of a common design or plan . . . is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 394 (*Ewoldt*).) "Unlike evidence used to prove intent, where the act is conceded or assumed, '[i]n proving [a plan or] design, the act is still undetermined. . . .' [Citation.] For example, in a prosecution for shoplifting in which it was conceded or assumed that the defendant was present at the scene of the alleged theft, evidence that the defendant had committed uncharged acts of shoplifting in a markedly similar manner to the

20

charged offense might be admitted to demonstrate that he or she took the merchandise in the manner alleged by the prosecution." (*Id.* at p. 394, fn. 2.)

Use of evidence for this purpose does not constitute impermissible character evidence. As we recently explained in another case where we upheld the admission of uncharged conduct on this basis, the theory of logical relevance that allows the admission of prior acts to negative a claim of accident or other innocent conduct "is sometimes described as 'the doctrine of chances.' " (*People v. Phillips* (2022) 75 Cal.App.5th 643, 672 (*Phillips*).) "The idea is that ' "Innocent persons sometimes accidentally become enmeshed in suspicious circumstances, but it is objectively unlikely that will happen over and over again by random chance." [Citation.] "The doctrine does not ask the jurors to utilize the defendant's propensity as the basis for a prediction of conduct on the alleged occasion. Instead, the doctrine asks the jurors to consider the objective improbability of a coincidence in assessing the plausibility of a defendant's claim that . . . he or she was accidentally enmeshed in suspicious circumstances." ' " (*Ibid.*) " ' "This type of evidence is admitted under several of the familiar category labels—absence of mistake or accident, modus operandi, or plan or scheme—but probability based reasoning underlies its relevance." ' " (*Ibid.*)

Similarity is the linchpin of admissibility under this theory, as it is for the other exceptions under subdivision (b) of Evidence Code section 1101. (See *Picazo, supra,* 84 Cal.App.5th 778 [2022 WL 14403798, at p. *17].) To establish a common design or plan, the uncharged conduct and charged acts need not be "part of a single, continuing conception or plot." (*Ewoldt, supra,* 7 Cal.4th at p. 401.) Rather, they must only be "sufficiently similar to support the inference that they are manifestations of a common design or plan." (*Id.* at p. 402.) That is, "evidence that the defendant has committed

21

uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense *pursuant to* the same design or plan he or she used in committing the uncharged acts" and do not simply reflect "a series of spontaneous acts." (*Id.* at pp. 403, 404, italics added.) In other words, the plan need not be an end unto itself. It may simply be a specifically identifiable modus operandi, based upon which the ultimate fact of guilt of the charged crime may be inferred. (See *Phillips*, *supra*, 75 Cal.App.5th at p. 678.)

Although the level of similarity between the uncharged acts and the charged offense required to prove the existence of a plan is greater than that required to prove intent, the difference is " 'of degree rather than of kind.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.) "[I]n establishing a common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*Ibid.*) But the plan itself "need not be unusual or distinctive." (*Ibid.*) This standard does *not* require " '[t]he pattern and characteristics of the crimes [to] be so unusual and distinctive as to be like a signature.' " (*Id.* at p. 403.) That kind of similarity is required only to prove identity, which requires the greatest level of similarity between the uncharged acts and the charged offense. (*Ibid.*)

The common design or plan theory of admissibility has been upheld many times in prosecutions for child sex abuse, including by the Supreme Court in *Ewoldt*. In that case, which also was a prosecution for lewd conduct with a girl under the age of 14, the Supreme Court upheld the admission of evidence the defendant, who was the complaining witness's stepfather, had

22

previously engaged in three uncharged acts towards her older sister several years earlier, and also one uncharged act toward the complaining witness herself, to establish the defendant committed the four charged offenses pursuant to the same design or plan. (See *Ewoldt*, *supra*, 7 Cal.4th at pp. 386, 387-389, 403.) The older sister testified that on three occasions she awoke in her bedroom to find her stepfather touching her breasts and vaginal area, and the third time he claimed he had simply been "straightening up the covers.' " (*Id*. at p. 389.) The jury could infer this took place when the older sister was around 10 or 11 years old. (See *ibid*.)

These details regarding the older sister most closely resembled only one of the four charged incidents involving her younger sister, who was the complaining witness. In one, when the complaining witness was 14, she awoke in her bedroom to find defendant touching her breasts but couldn't remember if it was under or over her clothes, " 'because this same thing happened many times.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 389.) He said he was just covering her with a blanket. (*Ibid*.) The three other charged incidents were different. In one, which took place about a year earlier, he also woke her up in her bedroom but that time, smelling of alcohol, he exposed himself to her and told her to touch his penis; the incident ended with her screaming and in a physical struggle. (*Id*. at p. 388.) The other two took place about a year or two earlier but in defendant's own bedroom; both times he was naked, fondled the complaining witness in her vaginal area, tried to and/or did undress her, and tried to spread her legs. (*Ibid*.)

In holding that the uncharged acts toward the older sister were admissible as evidence of a plan, despite these various factual differences, the Supreme Court explained: "In the present case, the victims of both the uncharged misconduct and the charged offenses were defendant's

23

stepdaughters, who were residing in defendant's home, and the acts occurred when the victims were of a similar age. On three occasions, defendant molested [the older sister] at night while she was asleep in her bed. When discovered, defendant asserted he was only 'straightening up the covers.' In two of the charged offenses, defendant molested [the complaining witness] in an almost identical fashion and, when discovered, proffered a similar excuse. On one occasion prior to the commission of the charged offenses, defendant touched either [the complaining witness's] breasts or her vaginal area. This marked the beginning of an ongoing pattern of molesting [the complaining witness]. We conclude, therefore, that evidence of defendant's uncharged misconduct shares sufficient common features with the charged offenses to support the inference that both the uncharged misconduct and the charged offenses are manifestations of a common design or plan. Such evidence is relevant to establish that defendant committed the charged offenses in accordance with that plan." (*Ewoldt*, *supra*, 7 Cal.4th at p. 403; see also *People v. Rhoades* (2019) 8 Cal.5th 393, 414-415 and authorities cited.)

*Ewoldt* is not alone in upholding the admission of uncharged acts on this theory where the charged and uncharged incidents involving child victims are not identical but nonetheless share basic similarities. For example, *People v. Dancer* (1996) 45 Cal.App.4th 1677 (*Dancer*) involved a prosecution for molesting a four-year-old neighbor living in defendant's apartment building where the appellate court upheld the admission of evidence the defendant once, 10 years earlier, had molested a 13-month-old baby girl with whom he had been living. (See *id*. at pp. 1683-1684, 1689-1690.) Despite a number of differences between the incidents including the victims' ages, *Dancer* held "the incidents share numerous common features" that "reasonably support an inference that each incident was a manifestation

24

of a common design or plan rather than two unrelated spontaneous acts." (*Id*. at pp. 1689-1690.) Those features included that "[d]efendant resided near the victims and was acquainted with their parents, . . . selected young girls as victims, . . . had a history of unsupervised access to the victims and played or babysat with them," "[t]he victims knew and trusted him, . . . he selected locations out of public view," some aspects of the physical touching were similar, and the defendant responded calmly both times when confronted by each girl's parents. (*Ibid*.; see also, e.g., *People v. Branch* (2001) 91 Cal.App.4th 274, 281 (*Branch*) [evidence defendant inappropriately touched victim's mother 30 years earlier held admissible in prosecution for child molestation; "the evidence was relevant to establish a common plan or scheme on appellant's part—that of molesting 12-year-old girls in his home"].)

Similarly, the trial court here did not abuse its discretion in ruling implicitly that E.'s testimony was relevant under Evidence Code section 1101, subdivision (b) as evidence of a plan. As in *Ewoldt*, both victims in this case were sisters and defendant's relationship to them was the same (his nieces), they were similar ages when the alleged misconduct took place,[10] and all of the acts, both charged and uncharged, took place at the same

---

[10] As discussed more fully in Part III, *post*, there was a discrepancy between B.'s contemporaneous recollection when she revealed the molestation at age 11 that the abuse had begun when she was 9, and her trial testimony several years later at age 14 that it had begun at age 6, with no recollection of how old she was when it ended. Defendant makes no argument that this discrepancy has any bearing on the Evidence Code section 1101 analysis, and we perceive none. In either case, his victims were pre-adolescent girls. Furthermore, B.'s trial testimony did not contradict her earlier statement to police that she had been molested by defendant at age 9. Timing-wise, she simply couldn't remember anything at trial other than when it had begun, not its overall duration.

general location (their grandparents' home). (See *Ewoldt*, *supra*, 7 Cal.5th at p. 403.) Likewise, defendant touched them in an "almost identical fashion" (*ibid*.): he touched their breasts after luring them both to a place of secrecy (the older sister, to a van on one occasion; the complaining witness, to his bedroom) and told both to keep his conduct a secret. The facts he was a minor when the uncharged conduct took place and that he touched B. *under* her clothing would certainly support a rational inference he grew more emboldened as he got older (and also, correspondingly, as the age difference widened between himself and the target of his advances), but those differences do not detract from the overall commonality of features sufficient to render the evidence concerning E. admissible as evidence of a plan, just as was true in *Ewoldt*. (See also *Dancer*, *supra*, 45 Cal.App.4th at p. 1690.) Given the similarities we have discussed, the evidence from E. tended to prove (in the parlance of the doctrine of chances) "the objective improbability" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1380) that the molestation of B. never occurred at all, and that she had just fabricated it to cover for her otherwise inexplicable fascination with pornography. That is to say, regardless whether a jury could infer defendant had a specific lewd intent of sexually arousing himself when he engaged in the uncharged conduct toward E. as a youth,[11] it "could rationally reject the coincidental explanation" for his

---

[11] Lewd intent as to E. was not required for the evidence to be admissible under Evidence Code section 1101, subdivision (b), because that section is not limited to criminal conduct. Further, defendant's cited authority, *In re Jerry M.* (1997) 59 Cal.App.4th 289, does not categorically preclude a finding of lewd intent by an 11 year old. "[M]inors . . . can be held responsible for numerous sex-related crimes." (*People v. Tobias* (2001) 25 Cal.4th 327, 334 [citing four cases involving minors between the ages of 11 and 13, including *Jerry M*.]; see also *In re Randy S.* (1999) 76 Cal.App.4th 400 [11 year old].) *Jerry M*., which involved an 11-year-old boy, noted in dicta that "[a]t some age younger than 14 years, which we need

26

having touched the older sister's breasts and vaginal area in an unwanted manner on multiple occasions when the two were both younger and the fact that, years later, her sister B. "just happened" to accuse him of similar conduct when she was around the same age. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 16; cf. *People v. McCurdy* (2014) 59 Cal.4th 1063, 1098 (*McCurdy*) [no abuse of discretion to admit evidence of defendant's incestuous molestation of his sister when they were children in prosecution for capital murder in connection with kidnapping with intent to molest unrelated child victim; despite various differences in the crimes including defendant's youth when he molested his sister, "it would not be speculative to infer that, because he had committed lewd acts against his sister when she was a child, he abducted [child murder victim] with the intent to commit a lewd act against her"].) These differences between the crimes went to the weight of the evidence, not its relevance. (See *McCurdy*, at p. 1099; accord, *Dancer*, at p. 1690.) Relatedly, whether or not he was too young to appreciate the wrongfulness of his conduct toward E. does not detract from its relevance under Evidence Code section 1101, subdivision (b), because his capacity to commit a crime against her is irrelevant under that statute. (See *McCurdy,* at p. 1100.)

---

not determine in this case, the minor cannot as a matter of law have the specific intent of sexual arousal." (59 Cal.App.4th at p. 300.) It held there was *insufficient evidence* of lewd intent in that case (which, unlike this one, did not involve any "attempt or opportunity to avoid detection . . .[,] no clandestine activity preceding the touching, no stealthy approach or modus operandi and no admonishment to the victims not to disclose the occurrence" (*ibid*.)).

## 2. Evidence Code Section 352

Having concluded E.'s testimony is not barred by Evidence Code section 1101, this brings us to the analysis required by Evidence Code section 352.[12] (See *Ewoldt*, *supra*, 7 Cal.4th at p. 404.)

As we explained in *Phillips*, "the 'undue prejudice' with which Evidence Code section 352 is concerned flows from evidence that 'uniquely tends to evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues'—evidence 'of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.' [Citation.] It is ' " 'not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' " ' [Citation.] Evidence Code section 352 'requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect. "Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " ' " (*Phillips*, *supra*, 75 Cal.App.5th at pp. 674-675.) This well-established standard entails consideration of several factors, with which we presume the parties' familiarity. (See generally *id.* at p. 675.)

In a case such as this, "[t]he principal factor affecting the probative value of the evidence of defendant's uncharged offenses is the tendency of that evidence to demonstrate the existence of a common design or plan."

_____

[12] "Our conclusion the evidence was admissible under Evidence Code section 1101, subdivision (b), obviates the need to consider whether [it] was also admissible under Evidence Code section 1108." (*People v. Ranlet* (2016) 1 Cal.App.5th 363, 376, fn. 3.)

28

(*Ewoldt*, *supra*, 7 Cal.4th at p. 404.)  While perhaps not as probative on the issue of plan or design as the evidence upheld in *Ewoldt* (which was "convincing" (see *ibid*.)), consideration of all the incidents here still constitutes strong evidence that defendant was acting pursuant to a plan when he touched both girls.  His physical touching of E. was very similar  in key respects to some of the ways he groped B., all of the incidents took place at the same location (his home) with female relatives of similar age, and there were more than six separate incidents in all (more than two with E., and more than four with B.).  E.'s testimony thus had substantial probative value. (See *Branch*, *supra*, 91 Cal.App.4th at p. 283 [evidence of uncharged molestation of victim's grandmother when she was a child was "highly probative in establishing appellant's use of a common scheme and plan with both victims"]; *Dancer, supra*, 45 Cal.App.4th at p. 1690 ["the evidence showing a common design or plan was strong," despite differences between single uncharged incident of child molestation  and charged conduct].)  The only significant distinction  between the incidents is the fact defendant was a minor when he touched E. inappropriately  whereas he was an adult when he molested B., which somewhat diminishes the probative value of E.'s testimony to show he was acting pursuant to a plan.  But not to such a degree that it significantly undermines an inference that his actions—on  multiple occasions—towards  E. were *not* just spontaneous and isolated.  A jury rationally could conclude that, beginning from around the time defendant was a pre-teen,  he had not only the intention but *a plan or method* for touching the bodies of pre-adolescent girls—specifically,  by taking advantage of opportunities to target young, female family members when they visited  at his home and to touch them in a place or at a time when nobody else was present, a plan or method that, as we have noted, a jury could rationally

29

conclude simply increased in audacity and sophistication as he matured into adulthood. (See *McCurdy*, *supra*, 59 Cal.4th at p. 1099 ["evidence that defendant had molested his sister when she was eight years old ([the murder victim]'s age when she was abducted), even though he was only 10 years old at the time, was highly probative of his intent during the [charged] kidnapping"].) The many common features of the uncharged and charged acts we have discussed distinguishes this case from the authorities defendant cites, where extreme dissimilarities between the uncharged sex crimes and the charged ones all but obliterated the probative value of the uncharged conduct at issue. (See *People v. Jandres* (2014) 226 Cal.App.4th 340, 356; *People v. Harris* (1998) 60 Cal.App.4th 727, 740-741; see also *People v. Cordova* (2015) 62 Cal.4th 104, 134 [distinguishing *Jandres* and *Harris*, in a case involving multiple similar sex crimes against different child victims].)

Some factors under Evidence Code section 352 cut the other way, as they did in *Ewoldt* where the Supreme Court still upheld admission of the uncharged conduct. As in that case, E.'s testimony about defendant's misconduct toward her was not "wholly independent of the evidence of the charged offenses" because she only accused defendant after B. had made a similar allegation against him (see *Ewoldt*, *supra*, 7 Cal.4th at p. 405), and likewise, the fact that defendant was not prosecuted in connection with her accusations increased the potential prejudicial impact of her testimony (see *ibid*.).

But evidence of E.'s accusations were less inflammatory than the charged incidents involving B. which lessened the potential for prejudice. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 405; *Picazo*, *supra*, 84 Cal.App.5th 778 [2022 WL 14403798, at p. *18]).) He did not touch E. underneath her clothing. In addition, he was much closer in age to her, and thus their

30

interactions did not entail any power imbalance inherent in adult/child interactions. There was little risk the evidence about E. would inflame the jury's passions against defendant or that the jury would convict him of molesting B. because his earlier conduct had gone unpunished. (See *Phillips, supra*, 75 Cal.App.5th at p. 676.)

Further, the passage of about seven and a half years between the time defendant groped E. and then engaged in similar conduct toward B. does not significantly reduce its probative value. (See *Ewoldt, supra*, 7 Cal.5th at p. 405.) " 'No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible.' [Citation] ' "[S]ubstantial similarities between the prior and the charged offenses balance out the remoteness of the prior offenses." ' " (*People v. Robertson* (2012) 208 Cal.App.4th 965, 992.) Appellate decisions have upheld the admission of prior uncharged acts much older than this against a charge of staleness. (See, e.g., *id*. at pp. 992-993 [uncharged sexual offense that occurred 34 years earlier not barred by Evidence Code section 352 where, inter alia, "appellant's modus operandi in both cases was virtually identical" and "[s]ince appellant flatly denied raping the victim in this case and there was no forensic evidence proving that a rape occurred, evidence bearing on the respective credibility of appellant and the victim was highly probative. Testimony that appellant committed a similar sexual assault on another woman was relevant to prove common plan and to bolster the victim's credibility"]; *People v. Soto* (1998) 64 Cal.App.4th 966, 977-978, 991, 992 [no abuse of discretion under section 352 to admit evidence defendant molested his niece and sister as children several decades before charged incident involving unrelated child victim; "As for the passage of time, we note the victims were within the same age range as [complaining child witness] when

31

the prior acts occurred. . . . [T]he passage of a substantial length of time does not automatically render the prior incidents prejudicial"]; *Branch*, *supra*, 91 Cal.App.4th at pp. 284-285 [30-year gap]; *People v. Cordova*, *supra*, 62 Cal.4th at p. 133 [13- and 18-year gaps].)

In short, the trial court did not abuse its discretion in concluding the prejudicial impact of defendant's uncharged conduct did not substantially outweigh its probative value.

### 3. Federal Due Process

Defendant's constitutional claim rests on the premise that the evidence was "inflammatory *yet wholly irrelevant*." As we have explained, it was neither. "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913; accord, *People v. Partida* (2005) 37 Cal.4th 429, 439 [same standard even when evidence is erroneously admitted under state law]; see generally *People v. Fuiava* (2012) 53 Cal.4th 622, 696-698.) Here it was not. For the same reasons we have concluded the admission of E.'s testimony did not violate state law, including that its probative value was not substantially outweighed by its prejudicial effect, we reject defendant's argument that its admission deprived him of a fair trial in violation of his federal due process rights. (See *Phillips*, *supra*, 75 Cal.App.5th at p. 680; see also, e.g., *People v. Benavides* (2005) 35 Cal.4th 69, 90-91 [erroneous admission of evidence offered to prove defendant was a child molester that was "of limited probative value" did not violate defendant's due process rights to a fair trial "because, generally, violations of state evidentiary rules do not rise to the level of federal constitutional error"].)

# III.

## *Defendant Was Properly Tried As an Adult*

As noted, there was a discrepancy between what B. recalled as an 11 year old in her December 2015 interview with law enforcement about the timing of defendant's molestation and her testimony on direct examination at trial three and a half years later, at age 14. At age 11, she told law enforcement (during a videotaped interview introduced into evidence) that the groping began "[w]hen I was probably like nine years old" and ended in March 2015 when she was 10 years old. At trial, she recalled it began when she was six years old and had no recollection of when it ended. Given their 10-year age difference, the parties agree defendant would have been a minor when B. was six years old and an adult when she was nine.

After B. testified, defendant made multiple requests to suspend the criminal proceedings and/or dismiss them: (1) the day after she testified, an oral motion to suspend criminal proceedings and transfer the matter to juvenile court under Welfare and Institutions Code section 604 because defendant would have been a minor when B. was six years old, which the court denied because defendant was not being *prosecuted* for anything that took place when he was a minor; (2) after the prosecution rested, an oral motion to dismiss the charges on the ground no reasonable juror could find beyond a reasonable doubt the incidents occurred during the timeframe alleged in the information when he was an adult (§ 1118.1) and a motion for a mistrial requesting a transfer to juvenile court on the same basis, both denied; and (3) a motion for a new trial asserting the court had failed to follow the statutory procedures required by Welfare and Institutions Code section 604, also denied.

On appeal, he argues the trial court abused its discretion for various reasons by failing to suspend the proceedings "once defense counsel brought

33

the motion that provided the court with information that suggested that appellant was a juvenile during the incidents." We reject this contention, for three principal reasons.

*First*, defendant's arguments are not supported by the statutory language. In relevant part, Welfare and Institutions Code section 604 states: "Whenever a case is before any court upon an accusatory pleading and it is suggested or appears to the judge before whom the person is brought that the person charged was, *at the date the offense is alleged to have been committed*, under the age of 18 years, the judge shall immediately suspend all proceedings against the person on the charge. *The judge shall examine into the age of the person*, and if, from the examination, it appears to his or her satisfaction that the person was *at the date the offense is alleged to have been committed* under the age of 18 years, he or she shall immediately certify all of the following to the juvenile court of the county: [¶] (1) That the person (naming him or her) is charged with a crime (briefly stating its nature). [¶] (2) That the person appears to have been under the age of 18 years *at the date the offense is alleged to have been committed*, giving the date of birth of the person when known. [¶] (3) That proceedings have been suspended against the person on the charge by reason of his or her age, with the date of the suspension. [¶] The judge shall attach a copy of the accusatory pleading to the certification." (Welf. & Inst. Code, § 604, subd. (a), italics added.)

By its plain terms, the statute does not require a hearing or certification to juvenile court when a defendant is indisputably over 18 on the date the prosecution alleges the crime took place. It specifies the court's duty of inquiry is triggered only when it appears a defendant was under 18 "at the date the offense is *alleged* to have been committed." (Welf. & Inst. Code, § 604, subd. (a), italics added.) Further, the statute does not specify that the

34

subject of the required examination is the actual date of the offense but, rather, "the age of the person" charged (*ibid*.), and the Rules of Court define a similar scope. (See Cal. Rules of Court, rule 4.116(b) [purpose of immediate suspension of criminal proceedings and required hearing is "to determine the true age of the person charged"].)

Here, consistent with Welfare and Institutions Code section 604, defendant was not charged for any conduct that took place before his 18th birthday (August 14, 2012).[13] The information alleged he molested B. "[o]n or about and between September 29, 2013 and September 28, 2015," a time period when he was between the ages of 19 and 21. The jury was instructed the charges pertained only to that timeframe (*and* that the prosecution had to prove beyond a reasonable doubt that the offenses took place during that timeframe, *and* that he was over 18 years of age at that time). And the verdict form expressly limited the charges to that timeframe. Indeed, relying on those instructions and the conflict in the evidence, defense counsel argued emphatically in closing argument—without any objection by the prosecution—that the uncertainty as to when the molestation took place was a complete basis to acquit defendant.

Defendant cites no legal authority and offers no legal argument as to why we should ignore the statute's plain language, and require a suspension of criminal proceedings for a potential juvenile court referral when a person is charged with crimes alleged to have taken place *only* when the person was indisputably an adult. Regardless of whether the jury could find that some of defendant's unlawful conduct began when B. was six rather than when she was nine, he was properly tried for crimes he was *alleged* to have committed as an adult. And the jury was required to find that the crimes were

---

[13] The jury was instructed that his date of birth was August 14, 1994.

committed while he was an adult. "In a case in which a defendant's participation in a crime begins while the defendant is a minor and continues after the defendant becomes an adult, that defendant has engaged in criminal conduct as an adult, and should not escape the consequences of that conduct simply because he or she first became involved in the conduct before reaching the age of majority. (*People v. Quiroz* (2007) 155 Cal.App.4th 1420, 1430.)

As the trial court aptly observed when the issue first arose, "the jury can only consider the time frame within the information. They can't base their decision on anything outside that timeframe. And so that would eliminate the issue that we have here." Precisely.

Second, even if we construed Welfare and Institutions Code section 604 more broadly to require a judicial determination of when the charged offense actually took place (as contrasted with simply how old the defendant would have been at the time alleged), a trial court does not abuse its discretion in denying certification to the juvenile court when, as here, there is conflicting evidence as to whether he was under 18 at the time of the charged offenses. (See *People v. Nguyen* (1990) 222 Cal.App.3d 1612, 1623; *People v. Alexander* (1923) 62 Cal.App. 306, 308.) Defendant cites no authority to the contrary. He contends "the evidence before the court did not establish by substantial evidence appellant's age at the time of the incidents," but the assertion simply reargues the weight of the evidence on this point which is not the function of appellate review. More to the point, in order to avoid being tried as an adult, it was *his* burden to prove by a preponderance of the evidence he was a minor at the time of the charged offenses (see *Nguyen*, at p. 1619; *People v. Quiroz, supra,* 155 Cal.App.4th at p. 1427), and therefore he cannot demonstrate error on appeal unless the evidence proves he was a minor *as a*

*matter of law.* (See *Estes v. Eaton Corporation* (2020) 51 Cal.App.5th 636, 651.) B.'s very brief trial testimony as a 14 year old about her age when the abuse began, which was at odds with her much more contemporaneous recollection as an 11 year old, does not compel such a finding. Nor does defendant even argue that it does.

Finally, any error was harmless. Defendant asserts the manner in which this issue was handled below was "evident[ly]" prejudicial, because he would have obtained a more favorable disposition in juvenile court, but that assertion presupposes that, in the absence of error, there would probably have been a finding that the molestation took place when B. was six and so he would have been tried as a juvenile rather than as an adult. That premise is unwarranted. Here, the jury heard conflicting evidence concerning the timing of the molestation, and it found beyond a reasonable doubt that B. was molested during a period in which defendant was incontestably an adult. Defendant fails to explain why he was prejudiced by any error in allowing the jury to decide that issue rather than the court, other than the nonsensical assertion that it required the jury to engage in " 'mental gymnastic[s]' " that were " 'beyond, not only their powers, but [anybody else's].' " We do not agree. In the circumstances of this case, we can think of no reason ourselves why a jury determination of that issue rather than a judicial one was prejudicial. Accordingly, any error was harmless.

## IV.

### *Sentencing*

Finally, defendant argues that at a minimum the judgment must be vacated and the case remanded for re-sentencing because the trial court failed to state its reasons on the record for imposing the upper term of eight years on count 1, and consecutive sentences on the remaining counts (for a

total term of 14 years and four months).  The court imposed the maximum sentence, and did so at the People's request.

The People argue the objection has been forfeited because defense counsel did not raise it below (and that defendant's ineffective counsel claim cannot succeed) but concede the error, and that concession is well-taken.  The record shows the court gave no explanation for imposing the maximum sentence, yet an explanation was legally required.  (See § 1170, subds. (b)(1)(5) & (c); Cal. Rules of Court, rule 4.420(i).)  The issue was forfeited due to the lack of a timely and proper objection (see *People v. Scott* (1994) 9 Cal.4th 331, 356), but we will nevertheless exercise our discretion to consider the issue on the merits (thus rendering moot defendant's ineffective assistance of counsel claim).

The parties disagree as to whether the conceded error was harmless.  Citing our decision in *People v. Sanchez* (1994) 23 Cal.App.4th 1680 (*Sanchez*), the People assert the error was harmless under the *Watson* standard because "the record supported the judgment."  Defendant argues we should instead apply the legal standard that we rejected in *Sanchez* (see *Sanchez,* at p. 1685) which was articulated in *People v. May* (1990) 221 Cal.App.3d 836, 839:  whether there is a "reasonable possibility that a statement of reasons would have altered the trial judge's conclusion or revealed reversible error[.]"  Defendant asserts, without explaining why, that the *May* standard is satisfied.

Neither party has engaged in any analysis of the actual sentencing choices before the trial court based upon the pertinent law and the record made at sentencing (including the parties' respective sentencing memoranda and the probation report), which leaves us to assess this prejudice issue in a

vacuum. Nevertheless, we agree with defendant that a remand is appropriate.

It is unnecessary to revisit our decision in *Sanchez* because the People overread it. True, we applied the *Watson* standard there. (See *Sanchez, supra*, 23 Cal.App.4th at p. 1684.) And we articulated it as embodying the principle that "[w]here . . . it is improbable that a lower court's sentencing choice would have been different if it had been reminded to state a proper reason, the constitutional provision forbidding reversal for insubstantial errors should apply . . . ." (*Id*. at p. 1686.) But even when reviewing sentencing error under *Watson*, "the reviewing court may not simply ask whether the imposed sentence would be 'wholly unsupported or arbitrary in the absence of error' but must also reverse *where it cannot determine* whether the [error] was determinative for the sentencing court." (*People v. Avalos* (1984) 37 Cal.3d 216, 233, italics added.) In *Sanchez*, this court *could and did* determine the error wasn't consequential. (And so did the appellate court in *May*. (See *May, supra*, 221 Cal.App.3d at pp. 839-840.).) Here, though, we cannot tell. And not just because the parties have provided us with no guidance on that subject in their appellate briefs.

In *Sanchez,* although the trial court failed to "give any specific reason" for imposing a consecutive sentence, it did express its general views about defendant's conduct and circumstances, and the record on the sentencing choice before it also was fairly one-sided. (See *Sanchez, supra*, 23 Cal.App.4th. at p. 1688.) By contrast, the court in this case expressed no views on any subject whatsoever. It was silent at the sentencing hearing but for imposing the actual sentence. Further, the sentencing factors were not so lop-sided that we can say with any confidence that the court probably would have come out exactly the same way had it explained why it was imposing

39

the sentence that it did; not even the People assert that position. We have reviewed the record made at sentencing, and it reflects a mix of factors that could well have supported a more lenient sentence. Thus, it called for a careful exercise of the court's discretion.

Furthermore, one of the Legislature's purposes for requiring the court to "state the reasons for its sentence choice on the record at the time of sentencing" (§ 1170, subd. (c)) is to facilitate appellate review. (See *Sanchez, supra*, 23 Cal.App.4th at p. 1691 (dis. opn. of Kline, P.J.).) And here, because the court did not state any reasons, we have no way of assessing whether the court refrained from considering improper factors when it exercised its discretion to impose the maximum possible sentence, which was not true in *Sanchez*. For example, defendant's sentencing memorandum objected that the court could not base its decision on facts inherent in the elements of the crime themselves (see *People v. Scott, supra*, 9 Cal.4th at p. 350), which is exactly what defendant said the prosecutor was urging the court to do. There were no dangers of potential legal error in *Sanchez*. (Nor in *May*, for that matter, where the appellate court expressly said so (see *May, supra,* 221 Cal.App.3d at p. 839 [failure to state reasons held harmless, and distinguishing other appellate decisions, because "there is no danger that the court may have made improper dual use of facts" in imposing sentence]).) "A reviewing court is entitled to presume the sentencing court properly exercised its discretion in imposing sentence *absent evidence to the contrary*" (*People v. Montano* (1992) 6 Cal.App.4th 118, 121, italics added), yet here the court's clear error in one respect at sentencing (i.e., failing to explain its reasons) undermines the confidence in the sentence which that presumption normally affords. Finding a trial court's error harmless in these circumstances, when it is being asked to do something the law does not allow and then fails to

explain its sentencing choices, would insulate the trial court's exercise of its sentencing discretion from judicial review for legal error, and render a legally erroneous sentence impervious to correction.

For all of these reasons, unlike in *Sanchez*, we do not find it "improbable the result would have been different had the court been reminded to state its reasons for consecutive sentencing" or for imposing the aggravated term on count 1. (*Sanchez, supra*, 23 Cal.App.4th at p. 1688; see also *People v. Tillotson* (2007) 157 Cal.App.4th 517, 545 [remanding for resentencing where court failed to state its reasons because "we cannot tell . . . whether it is reasonably probable [appellant] would have not received a more favorable sentence in the absence of error"].) Because on this record we "cannot determine whether the [error] was determinative for the sentencing court" (*People v. Avalos, supra*, 37 Cal.3d at p. 233), we do not deem it harmless.

## DISPOSITION

The judgments are reversed for the limited purpose of resentencing in accordance with the views expressed in this opinion. In all other respects the judgments are affirmed.

_____

STEWART, J.

We concur.

_____

RICHMAN, Acting P.J.

_____

MILLER, J.

*People v. Serna* (A164252)